last Monday for all of you in D.C. The first case this morning is 15-1356 Roche Diagnostic Operations v. Lifescan. Mr. Ruchis? Yes, ma'am. May it please the court, as this court noted in its prior decision in this action, the remand of the district court was solely for the purpose of construing the term electrode and any subsequent proceeding that might be necessary once the court construes that term. The parties agree that the electrode term should be limited to a microelectrode and the intrinsic evidence and plain meaning of the term microelectrode extends up to 1,000 microns. That's fully supported by the inherent meaning of the term microelectrode. But that's not the claim construction you pressed at the Markman. At the original Markman? Right. At the original claim construction, we had disagreed with respect to whether it should be limited to microelectrode at all. That's correct, Your Honor. Right. So you changed your position in the context of the motion for reconsideration, right? We accepted the disavowal that the district court found, but even under the disavowal the district court made an error of law, and that's the subject matter of the reconsideration. It made an error of law by accepting a preferred embodiment as a positive limitation into the claim, specifically the 100 micron limitation. But you were arguing for an entirely new and different claim construction on reconsideration than you were at the original Markman. Our argument was consistent in the fact that the claims cannot be limited to 100 microns, Your Honor. The claim construction from the very outset argued that the examples 3 to 5, for instance, the disclosure of examples 3 to 5 of the 146 patent, which includes electrodes of 300,000, 500,000 microns, have to be within the scope of the claims. So in that respect, our argument was consistent, Your Honor. It was simply a matter of whether you append the disavowal to microelectrode onto the claims as well. But all of the arguments that go to your second revised claim construction are different arguments with respect to the spec that applied to your first claim construction, right, where you're saying micro versus macro and then you're changing the numbers. It's an entirely different argument, right? You may say the result gets you to the same place. I can kind of see that, which seems to be what you're saying. But the analysis and the references is entirely different. Well, Your Honor, first of all, we relied on examples 3 to 5 with respect to the 146 patent. We relied on the intrinsic evidence, the disclosure of the Excalibur report, for instance, which shows that examples 3 to 5, those same configurations are microelectrodes in the context of the claims and the specification. We're concerned, as far as Roche would submit, that the claims from the very get-go cannot be limited to the 100 microns. But you're arguing a different claim construction now before us than you did at Markman, correct? The issue? Other than macroelectrode or microelectrode. Other than that, you're making a different claim construction argument before us than you did at Markman. I think that the only difference is whether we accept the disavowal of the claims to microelectrode. Originally, it is correct. We did not agree that that constituted the disavowal, the references in the prosecution history. But on reconsideration, we accepted the provision that the claims would be limited to microelectrode, but still argued that even with that limitation, the claims can't be so limited. Okay. At Markman, did you argue that microelectrode should be limited to less than 100 microns? What we argued was that under defendant's proposed construction, the claims would be limited to 100 microns and that disclosures of examples three to five would be read out of the claims as macroelectrodes. And that's what we cited was improper from the outset. You had to include the claims within the scope of the claims, examples three to five, of the 146 patent and the disclosures of the Excalibur report. But there's no dispute at the original Markman. Everybody conceded and was operating under the assumption that the 100 was the limit, right, for micro. What we had said was that under defendant's proposed construction, the term microelectrode would be limited to 100 microns and that disclosures of examples three to five would indisputably be macroelectrodes and outside the scope of the claims. But you dispute that that was a given, that that was how we would read micro. If you read the actual statements at the claim construction hearing, what we were arguing was in the context of defendant's proposed claim construction, these disclosed structures in the specification of the 146 patent and in the Excalibur report would indisputably be macroelectrodes and outside the claims. I'm still waiting with all these questions for a yes or no answer. You did not dispute, did you? I mean, you were all operating under the same given, which is the cutoff from micro and macro was 100. Yes, and that was based on defendant's proposed construction. That was their argument. We were countering that. But you didn't propose any alternative. I mean, you accepted that for purposes of your own claim construction. You didn't propose an alternative. Not with respect to what the term microelectrode should mean, correct. Can I just ask you a process question, which is have you asserted these patents in other cases? Not at this stage, Your Honor. But they're still pretty young. They're still pretty young, correct. They were issued originally in 2007. The issue, of course, is that the district court focused on remand, focused on a specific portion of a single sentence of the detailed description from the so-called definition passage, defendant's so-called definition passage, and the district court found in a special situation that it seems and it might be characterizing a microelectrode. And based on that, found that it was a microelectrode definition. In every instance with respect to the disclosure of the term microelectrode, or the reference to 100 microns or less is specifically identified as a preferred dimension. The very first time it pops up is in column 3, lines 9 to 12 of both the 146, 147 patent, where the disclosure explicitly states that 100 microns is simply preferred. You get to column 4 in the so-called definition passage. First of all, that definition passage starts out by pointing out that microelectrodes, as distinguished from other electrodes generally, are understood in the electronic and biosensor arts. That is not a disclosure under the Martek or Thorner line of cases of an exclusive definition. Before we get too much into the merits, the district court's main argument was that the motion for reconsideration was improper, right? Yes. And we review that for an abuse of discretion? We do review that for an abuse of discretion. Leaving aside, I know you've made a waiver argument, but aside from the waiver argument, where is the abuse of discretion by the district court in deciding that this was not? In the context of claim construction, an error of law is reviewed under certainly abuse of discretion, but an error of law itself is reviewed de novo. And if the district court, under the Third Circuit precedent, in the Quintero's case that was cited by defendants, for example, is a perfect example of it. It specifically says that where there is an error of law, which is reviewed de novo, then that is inherently an abuse of discretion. So the question for this court is to determine whether there is an error of law here and whether you determined it under the Third Circuit standard or the rolling claim construction standard. Let me ask you hypothetically, if the fight at the Markman is something yellow or green, and you lose and it gets to be yellow, that's your friend's thing, and then you can come up for reconsideration and say, no, it's all wrong. It's red. Is that a proper request for reconsideration? Well, this isn't that example, Your Honor. No, but just answer my question first. That would not be. I agree. So it's because red wasn't something that either party advocated before the district court. This isn't an argument that green, you went awry because green should have been the right answer. You can't come up with something new and different. How is this case different from that? Well, this is different, Your Honor, because it's not just a question of whether it's yellow or green. The district court made an initial finding that it was microelectrodes, initial finding, and based on that then said, well, with that disavowal, then this is yellow. And it's that second decision that microelectrodes have to be limited to 100 microns or less. It's that second step that we're contesting. So this is not simply a yellow or green. This is a two-step process. We argued it shouldn't be limited to microelectrodes at all, and the district court limited it to microelectrodes, and we said even if that's true, even if that's true, then microelectrodes shouldn't be limited to 100 microns because the district court is unquestionably taking a preferred embodiment and wrapping it into the claims as a possibility. The initial analysis that took place in the first instance about whether something was micro or macro was based, everybody was operating under the same assumption that we were using the 100 cutoff, right? Well, again, the only basis for that assumption is the text that Mark had been hearing originally, and in that context we were pointing out that the proposed construction of defendants was that a microelectrode would be 100 microns and that that can't be accurately describing the scope of these claims, given the disclosure and the specification. So it's true we were arguing against microelectrode originally, but from the very get-go our argument was these claims, based on the intrinsic evidence, have to encompass, examples three to five, have to encompass the disclosures in the Excalibur report, the intrinsic evidence in both of these applications, or the claims would be omitting a disclosed embodiment. We're into your rebuttal. Why don't we hear from the other side and we'll retain the rest of your rebuttal. Now there's a split argument on your side. Are you all splitting a particular issue or argument or just duplicating? Yes, Your Honor, may it please the court. With the court's indulgence, the appellees have agreed that NOVA's Mr. Badke will focus on the claim constructions and that I will focus on the procedural issues, which the previous argument has primarily addressed. On the procedural issues, there are two independent procedural reasons that this court should affirm the district court. First, the district court did not abuse its discretion to control its cases, and in particular to reject moving target arguments by denying the reconsideration motion in which Roche raised its present claim construction for the very first time. And second, Roche's failure in the first appeal to challenge Judge Farnan's denial of reconsideration waived that challenge, and that waiver in the first appeal applies to subsequent appeals under this court's case law. Can I ask you, if the original Markman had not focused on the distinction between micro and macro, but had just focused on the numbers, less than 100, more than 100, then your friend's reincarnation on the motion for reconsideration would sort of be in that same ballpark, would it not? I'm not sure I understand, Your Honor. I'm not sure if the original Markman had focused on the 100 micron. We all agree, I think, that essentially all the parties at that time were defining micro as being 100 or less, right? Absolutely. And macro as being higher. But if we hadn't used those labels, and they had just used the numbers, we're saying it's 100 or less, they're saying it's 100 or more, would that recast your view of what they were seeking in reconsideration? Yes, it would change the view of what they were seeking in reconsideration, because then reconsideration, if they were saying that the original limit was 100 microns to the claims, or they're saying it was not, and we were arguing that it was, if originally that argument was focusing on the same 100 micron limit, regardless of the label, we wouldn't be in this position. But the position that we are in, and the answer that the court was trying to get from Mr. Drutges, is made very, very clear by the arguments that he made in the motion for reconsideration. If we go to volume one of the appendix, pages 10.759 and 10.760 are two crystal clear admissions. He was relying on that 100 micron distinction to distinguish on the left-hand side on page 10.759. It took me a while to get through this huge group. What's the number again? 10.759. 10.759. He's addressing on this page examples three, four, and five, which, as Mr. Badke will address, is not part of the common specification.  All of which are substantially larger than the 15 to 100 microns that defendants would like the term electrode to be limited to. In this case, 10, 5, and 3 times larger than the maximum scope. And these, indisputably, are not microelectrodes. And then on the next page, he goes to address the examples in the Excalibur report. And he said, these two are directed to electrodes having, among other widths, 1,000 microns, 500 microns, 300 microns. Again, substantially larger than the dimensions that defendants would like to limit these claims to. And clearly, he says, macroelectrodes, not microelectrodes. In the face of that argument, what did Judge Andrews do? Throughout his opinion, he analyzed that. And he said that on reconsideration, this is page appendix 1.7, Roche moved for consideration positing a different claim construction theory than the one it had previously advanced. On page 1.8, Roche asserted that microelectrodes are up to approximately 100 microns wide. On page 1.9, Roche moved for reconsideration not seeking to re-argue that the asserted claims read only on microelectrodes, but arguing that microelectrodes may have widths up to 1,000 microns. And then at page 1.13, Roche argued a position in the claim construction hearing that it is subsequently partially abandoned. So the district court recognized this was a new position. And the district court has that discretion to reject this kind of moving target argument. And it didn't abuse its discretion in doing so. The district court, in this regard, it didn't err applying the Third Circuit reconsideration standard. This court's Golden Bridge made that clear. And this court's Golden Bridge case also made it clear that where a party raises its claim construction issue or raises an argument for the first time on reconsideration, that the court doesn't abuse its discretion. The district court does not abuse its discretion in denying that reconsideration. And they've argued new evidence here. But they haven't done what this court required that they do in the Delaware Valley floral opinion, which is come forth and show why that's really new evidence. And in fact, Judge Andrews made the finding that it wasn't new evidence. And so then the question comes from Roche, is this issue really properly before this court? And our position is absolutely it's properly before the court. Judge Andrews believed it was properly through the court. He went through and he parsed very carefully this court's opinion. And what he decided was that the mandate did not bar him from considering this procedural issue. And that's clear under this court's case law. It's like the Latrim case. What Mr. Drutchess said was that the court's opinion was very clear, that the court's mandate was very narrowly limited. Well, the mandate said to vacate and remand. The court's opinion said to consider those questions, decide the claim construction and any subsequent proceedings. It's just like the Latrim case, where this court remanded to reinstate the jury verdict. But the district court recognized that it had had preliminary issues before it could get to that and ended up granting JMOL and never reinstated the jury verdict. This court, when it remanded to Judge Andrews, he recognized that there were preliminary issues. And that issue was an issue that the court did not expressly decide and did not decide by necessary implication. Therefore, it was not precluded by the mandate rule. And also, it was not waived by the appellees. This court's case law is very clear. That waiver in that first appeal was by appellants, not appellees. Under this court's law, Independence Park and Latrim in particular, appellees in this circumstance do not waive because it's the appellants that chose the issue. They brought the appeal up in the first appeal, and they focused on the sole question of the claim construction. They did not challenge Judge Farnon's denial of reconsideration. So it's very clear under this court's case law, digital vending, that they waived. And it's very clear under this court's tronzo that waiver in the first appeal applies to the second appeal as well. So you're not just arguing that they're wrong and you didn't waive. You're saying they're the ones that waived. That's right. And it's two independent procedural reasons why the district court should be affirmed. First, because they waived in the first appeal, and that waiver applies here. But second, because their motion for reconsideration was improper, and Judge Farnon did not abuse his discretion in denying that motion for reconsideration because it was improper. And Judge Andrews very carefully went through that and explained why that motion for reconsideration was properly denied. He based his decision on that. The first half of his opinion was devoted to that, and this court should affirm because there was no abuse of discretion there. Those are two independent procedural reasons why the district court should be affirmed. Thank you. Brian Fabaggio for NOVA. May it please the court. These admissions that were made by Mr. Druchess were really not a mistake or an oversight. Roche is a leader in the glucose industry. We were two years into the case when these admissions were made. This was a well-informed decision that they made. In fact, it was informed by the- Which admissions are you referring to? The admissions on- The claims construction arguments at the Markman hearing? Yes, at the Markman hearing. I'm sorry, Your Honor. The example 3, 4, 5 admissions, that those are microelectrodes. In fact, that same testimony was given by Inventor Wilsey not once but twice. Was there an explicit admission or argument by counsel that microelectrodes were limited to 100 microns? Yes, I believe so. I think you can read that in that same site that Mr. Rucklidge gave. I think I can read into the argument, but was there an explicit concession? I don't believe there was anything more than was on those pages. I think that's all I'm aware of. Who came up with this? I mean, was there any debate about accepting this definition of micro versus macro? Was that just something that was given? I mean, everybody seemed to have been on the same page in the first instance. We were. Where did that come from? We were. Well, they were arguing originally that the term electrode should be defined as micro and macro. It wasn't important to them at the time. They accepted that micro was limited to 100, and then they only flipped after Judge Farnan ruled against them and said that no electrode means just micro. Then, of course, they knew about the allegedly infringing product, so they needed to expand that to 1,000 to capture them. But under their original definition, they thought they could capture the products, and that's why they did the flip-flop. But originally, this was not an issue, and it wasn't an issue before Judge Farnan. But the inventor, Wilsey, he also testified that Example 3, 4, and 5, which is their only specification support for their claim construction, that those are macro electrodes. In fact, he also testified that their product, which is called the Aviva, and that's 255 microns, is a macro electrode. So it was very clear throughout the course of this case, and I've been on this case from the very beginning and I was at the Martman hearing, it was very clear from the beginning of the case right through the Martman hearing that micro was considered 100 or less and macro was above that. And it's only because they needed to still try to capture us in infringement that they changed their position. But all of the evidence in this case points to what the original intent was and the original understanding of everybody, commonly, was about what micro meant. When did they change their position? During the motion for reconsideration at that stage? Yes. That's when they changed the position at the motion for reconsideration. And that's why Judge Farnan then denied it because it wasn't a new position. And as Judge Andrew points out, a reconsideration motion is not a basis for taking another shot at a claim construction when you're unhappy with the result. It's hard, though. I mean, every case is different and some of these cases are more complicated. I mean, it could be maybe in your experience, have you seen persons in the position of your friend that have argued alternative claim constructions? I've seen alternative but not completely contrary. This is a complete flip. Well, but if you were there in the first instance and you said, we think electrodes covers micro and macro, but if the district court, if you happen to conspire the other guy's argument and thinks that it only covers micro, then we think you ought to define these. Would that be crazy to do as an alternative at the original claim construction? That wouldn't be improper, would it? Well, I've seen plenty of crazy things in courts, right? Not in this court. Not in this court, Your Honor. No, absolutely not. But would I, if I'm in a district court, do a complete flip-flop on my position and take, you know, one day say it's white and the next day say it's black? No, I wouldn't do that. I've seen people take alternative positions. I've seen people try to massage the construction over time, which is what the rolling claim construction, Mr. Drutges, is talking about. You know, you raise the issue with the court and sometimes the court will think, well, yeah, okay, we didn't quite get that right. Let me tweak this a little bit. But this isn't a tweak. This is a wholesale change. And not only that, but it goes against their own admissions and the inventor's admissions. Okay, and so this is a lot different than other circumstances or a rolling claim construction. Maybe you get to trial and the judge thinks, well, we didn't quite get that right. So let's tweak it. This is a whole different scenario, a whole different scenario. Now, I want to point out a couple of things, and time is short. And the things I want to point out are things that I think that we've mentioned in our brief but have not, I think, received the emphasis that they should. And that's this issue of common specification. And my friend across the aisle here has used that term and everybody uses it, but what does that mean? It does not include examples 3, 4, and 5. It includes what's in the 147 patent and in the provisional. They added these examples 3, 4, and 5 into the 146 patent. And under the Synergem case, they shouldn't even be relevant in deciding what the claim term means. 3, 4, and 5 should be out altogether. Now, if you look at the common spec, there's a definition in there. It's all about microelectrodes. And what it teaches is you're at 100 or less. You get the benefits of the invention at 100 or less. So the entire common spec is about microelectrodes. There's no alternative described once you take out, and not that 3, 4, and 5 describe an alternative when it comes to blood because they were not done in blood. And therefore, don't fall within the scope of the claims. But there's no alternative given in the common spec. And so I think as a matter of law, you can exclude examples 3, 4, and 5 from your consideration of what the intrinsic evidence is here because it's not the common spec. We agreed that the term electrode should be defined the same way for both patents. And it can't add subject matter to one and not in the other and then have that apply to the common medium. What are the arguments that examples 3, 4, and 5 were not enabled? Well, they're not enabled because if you look at them, they were not done in blood and the claims are limited to blood. They were also done with a capillary depth of 62 microns. The patent specifically teaches in column 18 of the 147 patent that capillary depths below 100 shouldn't be used with blood because you don't get a fast fill. And the whole point of this patent is fast fill and fast detection. The other thing I want to... What does fast fill mean? The speed at which the blood enters into that other channel? Yes, that's right. And if the channel is too narrow because blood is viscous, it's more viscous than, say, water because it has cells in there and so forth, it's going to go a lot slower. So if the whole point of your patent is a fast response time, a fast detection time, it just defeats that whole purpose. But what does the speed have... Does the speed have something to do with the mixture of the chemicals once the blood enters into that particular channel? Or is it the charge that the strip gives to the blood once it's in there? No, I think it's just the speed because it's viscous. You don't get enough blood into the reaction area fast enough because it just takes too long to go down that really narrow channel. It's just a physical thing as far as I understand it. But the other thing, too, that I wanted to point out, which is one thing that I don't think received a lot of attention, but it's a very important point. If you look at the prosecution history, they actually distinguished prior art that was not blood. It was saline, glucose buffer saline solutions. They distinguished that prior art on the basis that you can't compare it to blood. They distinguished that art by saying, well, look, you get different reaction times when you do this in blood than you do in saline or serum or anything else. That's an important point. They shouldn't be able to argue and distinguish prior art by saying that blood is a lot different than serum or glucose, and then at the same time now argue that, well, you can just take examples three, four, and five, and you can just run them in blood. The fact is they didn't run them in blood. They ran them at a very shallow capillary depth. That's what they did. They threw these examples into the patent after they saw the competitive products. That is not a proper way, and I think the last time Judge Bryson asked Mr. Drutches a question on this, that's not a proper way to expand the scope of a claim after you've seen your competitor's product. That's exactly what happened. When they were going through the patent office, they had one view, and after the infringement case started, they have another view. And this is just another example of where they've switched positions and done complete flip-flops on their positions. Thank you. Your Honors, with respect to the reconsideration procedural issues, there's no question that Judge Farnan reviewed the reconsideration motions substantively. In fact, that's the reason why he indicated that it would be a, quote, and I think he might have a point. In the prior appeal, this court found that, quote, Nova and Lyskan do not dispute on appeal, however, that Roche's argument, its reconsideration argument, should be addressed on the merits, end quote. And that's the prior decision at 994. This court's decision also found that we remand the case to the district court for the purpose of construing the term electrode and any subsequent proceeding that might be necessary once the court construes the term. And the district court found on remand that defendants provided citations, don't provide any argument at all about reconsideration being procedurally improper in the prior appeal. And specifically, the district court found at 1.14 that I do not see any evidence that defendants put the federal circuit on notice, that defendants were arguing that the federal circuit should affirm the claim construction on the basis of a waiver argument. That is itself a waiver by defendants. With respect to the further proceedings, this court allowed the district court to, on remand, to decide whether and to what extent each party should be allowed to supplement the record. The district court allowed the parties, quote, to supplement the record as they saw fit, end quote. That's at A1.15. And even on remand, defendants never objected to any of this additional evidence or issues that they themselves argued only on reconsideration, such as this enablement argument that the parties have been addressing and the fill time argument, et cetera. All things raised by the first time by the defendants on reconsideration that were addressed by this court in a prior appeal and indeed on remand. Are you arguing that permitting parties to supplement the record also permits new arguments to be made? I think that the first of all, the new arguments, there were no new arguments made on remand. They were providing additional evidence regarding the existing arguments, the fast fill arguments, et cetera, and pointing out how, for example, fast fill is irrelevant to the claims, something that we argued on reconsideration and before Judge Farnan, we argued on remand. Yet again, this whole fast fill concept, fast fill is the detection time occurs at the point where fill has taken place. And it's only after that time where the 10-second test time occurs, and it's that time frame which is within the scope of the claims. This fast fill argument based on range of inadequacy, et cetera, doesn't relate in any way to the claims. It's a matter of law. Were examples 3, 4, or 5 disavowed by room? No, examples 3, 4, or 5 were never disavowed, and this is in distinct contrast to the Honeywell case where the specifications specifically demeaned particular embodiments. The examples 3, 4, or 5 were described as embodiments of the invention. Specifically, if you look at column 4, lines 3 through 5, they describe figure 9, which is the box hook electrode as used in example 3 as being an, I quote, alternative embodiment of the invention. And that is just one example, again, of the distinctions between this case and a case like Honeywell or others where the specifications specifically demean or there's a specific disclaimer in the specification of a particular configuration. With respect to the Wilsey deposition testimony, the Wilsey deposition testimony, first of all, took place in a different case before the patents had ever even issued. Wilsey was being deposed with respect to theoretically a different patent and was asked a number of questions. He was directed to a couple of lines of the specification here and asked to construe based on those couple of lines what would or would not possibly fall within the scope of a micro or macro electrode. If you look at his testimony, if you look at the Surge testimony that's cited in their briefs, you'll find that it doesn't support the kind of admission. And it's the very reason why this court found in EPAS, for instance, that such testimony is of little property value. Thank you. We thank all counsel in the case to submit.